USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 8/31/17

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

THERESA S. BROWN,

                Plaintiff,

-against-

CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

16-cv-03193 (ALC)

OPINION AND ORDER

**ANDREW L. CARTER, JR., United States District Judge:**

    Plaintiff Theresa S. Brown brings this action to reverse a final decision of Defendant Carolyn W. Colvin, then the Acting Commissioner of Social Security (the "Commissioner"), that Brown was not entitled to Supplemental Security Income benefits or disability insurance benefits. The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons that follow, the Commissioner's motion is denied, Brown's motion is granted, and the matter is remanded for further proceedings.

## BACKGROUND

### I. Procedural History

    Brown filed an application for Supplemental Security Income benefits ("SSI") and disability insurance benefits ("DIB") on September 23, 2014, alleging that her disability began on October 4, 2010. R. at 121-36.[1] The Social Security Administration initially denied her applications on October 28, 2014. *Id.* at 63-70. On Brown's request, a hearing was held on November 5, 2015, before Administrative Law Judge Michael Friedman (the "ALJ"). *Id.* at 25-41, 73-74. The ALJ denied Brown's application by decision dated November 19, 2015, finding

---

[1] "R." refers to the administrative record prepared by Defendant. ECF No. 10.

that she was not disabled during the relevant period. *Id.* at 11-24. Brown requested a review of the ALJ's decision by the Appeals Council. *Id.* at 10. On March 14, 2016, the Appeals Council denied her request for review, rendering the ALJ's decision the final decision of the Commissioner. *Id.* at 1-6.

Brown commenced this action on April 29, 2016, seeking judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). ECF No. 1. After the Commissioner filed her answer and the administrative record, Brown moved for judgment on the pleadings. ECF Nos. 11 (Motion), 12 ("Pl's Memo."). The Commissioner cross-moved for judgment on the pleadings on December 13, 2016. ECF Nos. 14 (Motion), 15 ("Def's Memo."). Brown did not file a reply brief, and the Court considers the motions fully submitted.

**II.    Factual Background**

**A.    Brown's Background**

Brown was born on February 2, 1953, and was 61 years old at the time she applied for disability benefits. R. at 121. Brown completed high school in 1971, which is her highest level of education, and has never completed any specialized job, trade, or vocational school. *Id.* at 164. In a disability report compiled for her benefits applications, Brown reported that she could speak and understand English, as well as read and write English. *Id.* at 162.

Brown worked from August 1999 to June 2014 as a childcare provider for children ages six months to six years old. *Id.* at 28-29, 164. Brown watched the children at her home for approximately ten hours each day, five days per week. *Id.* At first, she watched six children, but eventually, that number decreased to two children. *Id.* at 28-29. Brown reported that she stopped working in June 2014 "[d]ue to health problems." *Id.* at 29. Marion Greene, a vocational expert who testified during Brown's administrative hearing, characterized Brown's occupation as a childcare worker as a "medium exertional level" and "SVP 3." *Id.* at 40-41.

At the time of her hearing before the ALJ on November 5, 2015, Brown testified that she lived in an apartment with her daughter. *Id.* at 28. She further testified that she went grocery shopping two times each week and could "probably" lift grocery bags that weighed between five and ten pounds. *Id.* at 34-35. She also stated that she tried to clean her apartment occasionally. *Id.* at 35. Brown confirmed that spent most of her time on the couch watching television or napping because "there's nothing else that [she] can do." *Id.* at 35-37. However, she still prepared her own meals. *Id.* at 35.

Brown's application for DIB and SSI was based on her hyperlipidemia, asthma, hypertension, diabetes mellitus, and hip pain resulting from "bursitis vs osteoarthritis." *Id.* at 163. During her hearing before the ALJ, she testified that she was diagnosed with diabetes approximately ten years earlier, and took three different medications in an attempt to control it. *Id.* at 32. She testified that her A1C was 11.8, but that it had decreased to 10.1. *Id.* at 32.[2] Brown testified that she gets dizzy sometimes and has had a difficult time maintaining proper blood sugar levels. *Id.* at 32-33.

She also explained that she has coronary artery disease, describing her diagnosis as involving "three blocked arteries." *Id.* at 30. She said she experiences shortness of breath and chest pain, but she manages the chest pain with Isosorbide and Tramadol, the latter of which "puts [her] to sleep." *Id.* at 30-31. Brown testified that she had not had any corrective procedures on her heart because her doctors believed her diabetes would make a procedure too dangerous. *Id.* at 31. In particular, they wanted her A1C to be 7.0. *Id.* at 32.

---

[2] "An A1C test is a common blood test used to diagnose type 1 and type 2 diabetes and then to gauge how well [the patient is] managing [her] diabetes." *See* http://www.mayoclinic.org/tests-procedures/a1c-test/home/ovc-20167930.

3

With regard to her physical abilities, Brown testified that she could stand for ten to 20 minutes and could remain sitting for approximately one hour, indicating that she is slow moving once she stands up from sitting for that length of time. *Id.* at 33. Further, she said she could walk one and a half blocks without stopping to catch her breath. She noted that her left hip bursitis also requires her to take breaks when walking. *Id.* at 33-34. The medication she takes for her chest pain also serves as a pain killer for her hip. *Id.* at 34. When asked, Brown stated that she began going to physical therapy for her hip on a daily basis in June 2015. *Id.* at 39. The physical therapist told her that physical therapy was futile because she needed surgery. *Id.* at 39. Similar to her ability to undergo a cardiac procedure, Brown believed that hip surgery would not be possible because of her diabetes. *Id.*

### B. Medical Evidence in the Record

The medical evidence in the record primarily consists of treatment notes from Metropolitan Hospital Center ("MHC") and Mt. Sinai Hospital. Brown was treated by various physicians and other healthcare providers in the emergency departments and outpatient clinics at each hospital. There are records from MHC between September 21, 2012 and August 23, 2013. The records from Mt. Sinai are dated between May 9, 2013 and October 9, 2015.

#### 1. Metropolitan Hospital Center

The first record from MHC reflects that Brown went to the emergency room on September 21, 2012. *Id.* at 202-04. She was brought to the emergency room in handcuffs by the police after experiencing dyspnea (labored breathing), and appeared upset and crying. The doctor determined she experienced asthma exacerbation. Brown returned to the MHC emergency room four days later complaining of pain in her wrist and shoulders and exhibiting a cough. *Id.* at 205-07. The wrist pain was reportedly from the handcuffs used by the police on September 21. On examination, Brown's neck was not tender, but she was found to have a

4

decreased range of motion. The doctor also noted that Brown had decreased breathing sounds and rales.[3] Notes from a visit at MHC the following month do not reflect any continued neck or wrist soreness. *Id.* at 326-28. However, the doctor did note that Brown had osteoarthrosis and reported pain in her hip and pelvis. The doctor further noted that Brown's asthma was stable, but her diabetes and hypertension were uncontrolled and not regularly medicated.

Brown returned to MHC on November 14, 2012, primarily to address her diabetes mellitus and hypertension. *Id.* at 329-31. Blood tests revealed that Brown's blood sugar levels were elevated, but the notes also reflect that Brown had not taken her medication for two months prior to the blood test. She was prescribed a new diabetes medication and directed to have more blood tests in advance of her next appointment. In response to Brown's elevated liver enzymes, she had an abdominal sonogram performed in December 2012, which showed no acute abnormalities. *Id.* at 332.

Brown returned to MHC on January 9, 2013 for a diabetes "check," complaining of excessive thirst and urination, lightheadedness, and blurry vision. *Id.* at 333-37. Brown had not been taking her newly-prescribed diabetes medication, stating that it made her dizzy. In the notes, Brown's self-management of her diabetes is described as uncontrolled, and the doctor stated that he advised her regarding compliance with her medication regimen and the importance of diet for diabetes management. Brown was diagnosed with uncontrolled diabetes and unspecified, essential hypertension. The notes reflect that Brown did not have any edema. She was directed to return to the diabetes clinic at MHC in one week for a follow-up visit.

---

[3] Brown also visited the behavioral clinic at MHC on September 28, 2012 for depression following her arrest. R. at 208-13. Brown does not contend that her disability is based on any behavioral impairments and has not argued that the ALJ erred in failing to consider the results of that visit. Thus, the Court will not address Brown's September 28 visit to MHC's behavioral health clinic in its disability analysis.

5

At this follow up appointment on January 16, 2013, Brown reported occasional pain in her left flank and lumbar area. *Id.* at 338-41. She described the pain as a dull ache, and rated her pain as a seven on a ten-point scale. Examination confirmed mild tenderness in her left lumbar spine and left flank, which the examining physician believed was "probably musculoskeletal." Brown also stated that she had exertional chest pain, which was relieved by rest. As to her diabetes, Brown's blood sugar and other test numbers were improving due to her renewed compliance with her medication regime. She was again directed to return to the diabetes clinic at MHC for a follow-up appointment in two weeks.

During a visit on February 20, 2013, Brown's diabetes and hypertension remained uncontrolled, although it is not clear whether Brown had been compliant with her medication regimen. *Id.* at 223-27, 344-48. The notes reflect diagnoses of diabetes and osteoarthrosis, although Brown had a normal range of motion in her joints and no tenderness. The doctors directed Brown to return to the diabetes clinic in two months.

In March 2013, Brown had a myocardial perfusion scan and EKG stress test performed at MHC to determine whether she had coronary artery disease. Both tests were normal. *Id.* at 245-47, 349-56. Brown returned to MHC on March 13, 2013 for a follow-up appointment. *Id.* at 357-60. During this appointment, she also reported that she had been experiencing cervical spine tenderness for approximately one month. Brown also expressed discomfort in her foot, resulting from her diabetes and an ingrown toenail. Therefore, on referral, Brown saw a podiatrist at MHC two weeks later. *Id.* at 361-63. Brown complained of pain and burning in her feet. The podiatrist diagnosed her with neuralgia, neuritis, and radiculitis, secondary to her diabetes.

Brown returned to MHC the following month, on April 17, 2013, for what appears to be a regular diabetes check-up and an x-ray of her feet. *Id.* at 218-22, 244, 364-69. The x-ray

showed plantar spurs in both feet. *Id.* at 244, 364. MHC notes from her appointment indicate that Brown's diabetes and hypertension continued to improve, but remained uncontrolled because Brown still was not in compliance with her treatment regimen. Brown denied chest pain and swelling in her lower legs and showed no edema.

Notes from a physician at MHC's diabetes clinic on May 1, 2013 reflect that Brown reported she felt well and was compliant with her diabetes medications. She was scheduled for a follow-up appointment in two months. *Id.* at 214-17, 370-73. Plaintiff also went to the podiatry clinic on May 1 for a follow-up appointment, but because she had not had the required NVC (nerve conduction study) and EMG (electromyogram) performed after her last podiatry appointment, she was directed to return to the clinic after her tests. *Id.* at 374-76.

On June 4, 2013, Brown saw a physician at MHC for rehabilitation and pain management related to her foot neuropathy. *Id.* at 232-34, 377-79. The doctor noted that Brown came into the clinic walking without any assistive devices and that Brown reported she could walk two blocks without pain. An examination revealed that Brown had pitting edema in her lower extremities, thin and shiny skin, loss of foot hair, and discolored toenails. Brown was diagnosed with neuralgia, neuritis, and radiculitis, and scheduled for an EMG later that month. The EMG showed peripheral sensory polyneuropathy. *Id.* at 231, 380. At a follow-up examination on August 23, 2013, the podiatrist noted that Brown had no edema. *Id.* at 235-36, 383-85.

On August 20, 2013, Brown went to urgent care at MHC, complaining of excessive thirst and urination after missing one day of her medication. *Id.* at 228-30, 381-83. She was directed to follow her medication regimen and follow up with her primary care physician. She also was referred to MHC's "rehab clinic" for reported back pain.

### 2. Mount Sinai Hospital

The earliest record from Mt. Sinai Hospital is a CT scan and chest x-ray performed on May 9, 2013 to rule out a pulmonary embolus. *Id.* at 287-90. The scans were normal and showed no pulmonary embolus.

Brown next visited Mt. Sinai on June 14, 2013. *Id.* at 280-81. She arrived to the emergency room reporting shortness of breath, chest pain, and diaphoresis. While she was able to speak in full sentences, she was short of breath while doing so. Cardiology recommended an outpatient echocardiogram and diagnosed Brown with atypical chest pain. She was discharged with a diagnosis of asthma exacerbation. At an examination in the emergency room the following month, Brown again reported chest tightness and was diagnosed with asthma exacerbation and prescribed a nebulizer treatment. *Id.* at 277-79. Brown went to the emergency room again on July 22, 2013, and reported continued chest pain and shortness of breath. *Id.* at 274-76. An examination revealed no decreased breathing sounds or rales; however, Brown was advised to "establish care with a cardiologist." Both the physician and physician's assistant noted that Brown had no pitting edema. Additionally, an x-ray performed showed no acute pulmonary disease. *Id.* at 284-85.

Brown returned to the Mt. Sinai emergency room on February 27, 2014 for a persistent headache, but also reported that she began experiencing chest pain during her walk to the hospital. *Id.* at 260-263. She described the chest pain as chronic, worsening with exertion, and generally worse "in the last few weeks." Her EKG was normal, but a subsequent examination concluded that Brown had chest and abdominal tenderness. Brown was diagnosed with a tension headache and her chest pain was attributed to costochondritis. The physician discharged Brown

with a recommendation to take ibuprofen for both issues. The attending physician noted that Brown did not have any edema.

Brown visited the Mt. Sinai emergency room again on July 2, 2014, complaining of abdominal pain, including diarrhea and nausea. *Id.* at 253-57, 299-305. The physician's review of her systems, including cardiovascular and pulmonary/respiratory, were normal, and no edema was noted on Brown's legs. An EKG performed at the hospital was normal. Brown reported that she had not taken her blood pressure medication for approximately one week. She also reported that she experienced chest pain during her walk to the hospital. After being cleared for discharge, Brown left the emergency room walking with a steady gait.

On April 3, 2015, Brown was evaluated by Dr. Michael Herscher. *Id.* at 412-17. Dr. Herscher noted that Brown had a history of vertigo, coronary artery disease, non-cardiac chest pain, hyperlipidemia, asthma, hypertension, diabetes, and arthritis. He further noted that Brown had severe hip pain and had been feeling depressed due to her pain and the potential eviction from her apartment. Dr. Herscher's examination revealed that Brown was "very tender" on palpation of the left hip, but had full strength and range of motion. Dr. Herscher reported that he could see "mild degenerative changes" in her hip as compared to an x-ray he ordered in September 2014, and that weight loss would be a "crucial part" of Brown's improvement. *See id.* at 282, 311 (x-ray report showing mild osteoarthrosis). He also referred her to physical therapy and an orthopedic surgeon. He found no edema in Brown's legs.

On April 13, 2015, Dr. Herscher filled out a Cardiac Impairment Questionnaire, diagnosing Brown with coronary artery disease, hyperlipidemia, hypertension, and diabetes mellitus. *Id.* at 315-20. Dr. Herscher stated that a cardiac catheterization showed that Brown had non-obstructive coronary artery disease. *Id.* at 315. He also noted that Brown suffered from

chest pain on a weekly basis caused by physical exertion, but that she had never experienced any acute cardiac events. *Id.* at 316-17. Dr. Herscher stated that Brown could stand and/or walk for two hours and sit for six hours or more during the course of an eight-hour workday. *Id.* at 317. Further, he stated that Brown was able to frequently lift and carry zero to ten pounds, could seldom lift or carry between ten and twenty pounds, and could never carry more than that. *Id.* Dr. Herscher surmised that Brown's symptoms would increase in a physically demanding work environment because her hip pain was exacerbated by activity. *Id.* at 318. Dr. Herscher also opined that Brown's symptoms were occasionally severe enough to affect her attention and concentration. *Id.* While he believed that Brown's coronary artery disease was likely to persist for at least 12 months, he did not believe her hip pain would last that long. *Id.* at 319.

Dr. Herscher also completed a Disability Impairment Questionnaire on April 13, 2015. *Id.* at 321-25. He again diagnosed her with coronary artery disease and uncontrolled diabetes, but also identified obesity, depression, and hip arthritis in this questionnaire. *Id.* at 321. He opined that none of Brown's impairments were expected to last longer than 12 months. *Id.* His assessment of her ability to sit and stand and lift and carry weights was the same as in the Cardiac Impairment Questionnaire. *Id.* at 323. He also similarly characterized the likelihood that Brown's symptoms would increase in a physically demanding workplace. *Id.* at 324.

Brown returned to Dr. Herscher on May 27, 2015, reporting lateral and medial hip pain and chronic chest pain, and for a follow-up visit regarding those issues and her diabetes, asthma, hypertension, hyperlipidemia, coronary artery disease, and arthritis. *Id.* at 407-12. Dr. Herscher again reported that he could see "mild degenerative changes" in Brown's hip since her September 2014 x-ray, but that the pain could be relieved with weight loss. Brown's

hypertension was controlled, and she reported that she had been taking her hyperlipidemia medications.

Brown had a follow-up appointment on July 15, 2015— not with Dr. Herscher—to discuss her various ailments. *Id.* at 400, 402-06. The doctors noted that Brown had poor "glycemic control" and admitted inconsistent medication compliance. Her blood pressure was well controlled, however. Brown presented with trace pitting edema up to her mid-shin, but her pulmonology and cardiology examinations were normal.

One week later, on July 21 2015, Brown experienced chest pain and was seen by another doctor at Mt. Sinai for an urgent visit. *Id.* at 393, 397-98. The doctor noted that Brown appeared anxious although her EKG results were unchanged from her previous test and her cardiac and pulmonary examinations were normal. The doctor also noted no pitting edema in Brown's lower extremities.

On October 9, 2015, Brown had both an EKG and chest x-ray ordered after she arrived to Mt. Sinai's emergency department complaining of chest pain. *Id.* at 418, 420-21. The EKG showed an "incomplete right bundle branch block." The chest x-ray showed no acute pulmonary disease.

According to a letter from Mt. Sinai dated October 1, 2015, beginning in May 2015, Brown also saw a social worker at Mt. Sinai for "talk therapy" as part of the hospital's Depression Care Program. Brown was not on anti-depressants at that time and there is nothing else in the record regarding Brown's treatment for depression. *Id.* at 389.

### 3. SSA Consultative Examiner

At the request of the Social Security Administration, Dr. Carlos Giraldo examined Brown on October 21, 2014. *Id.* at 291-94. Dr. Giraldo noted that Brown had a medical history of

11

hyperlipidemia, uncontrolled diabetes, hypertension, well-controlled asthma, edema in both legs, and, more recently, right thumb tendinitis. *Id.* at 291. Dr. Giraldo reported that Brown complained of constant, but worsening, pain in her left hip since 2004, which pain she rated as an eight out of ten. She further reported to Dr. Giraldo that the pain was worse when she walked or sat. Brown reported that she cooked, cleaned, and did her laundry two times per week, shopped once per month, and was able to shower and dress herself on a daily basis. *Id.* at 292.

Dr. Giraldo's examination of Brown revealed that she had an antalgic gait, appearing to favor her right leg. Brown also appeared uncomfortable while sitting, but was able to get on and off of the examination table on her own. Brown was able to perform a half squat and showed a limited range of motion in her left hip. *Id.* at 292-93. She had a full range of motion in her cervical and lumbar spine and shoulders, elbows, forearms, and wrists, however. *Id.* at 293. Dr. Giraldo also noted that Brown had 1+ pitting edema. *Id.*

He diagnosed Brown with asthma, diabetes, hypertension, left hip pain, hyperlipidemia, right thumb tendinitis, and bilateral edema. *Id.* at 294. Dr. Giraldo determined that Brown had mild limitations walking, climbing, squatting, sitting, and using her right hand. Further, he opined that she should avoid prolonged standing due to her bilateral edema and stay away from smoke, dust, and other respiratory irritants because of her history of asthma. *Id.* at 294.

## DISCUSSION

**I.    Standard of Review**

    **A.    Judicial Review of the Commissioner's Determination**

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or

if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). Substantial evidence, as set forth in § 405(g), is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess v. Astrue*, 537 F. 3d 117, 127 (2d Cir. 2008) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004)) (internal quotation marks omitted).

A reviewing court "must be careful not to substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks omitted, alteration in original). However, a court "will not defer to the Commissioner's determination if it is the product of legal error." *Id.* (citation and internal quotation marks omitted).

**B.      Commissioner's Determination of Disability**

**1.      Definition of Disability**

A disability, as defined by the Social Security Act, is one that renders a person unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) *accord* 42 U.S.C. § 1382c(a)(3)(A). Further, the disability must be serious enough that the claimant "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B).

A claimant's subjective complaints about his or her symptoms are, alone, not enough to establish a disability. 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996). These complaints must be corroborated by medical findings showing a

13

medical condition that reasonably could be expected to result in the conditions that, considered with all of the other evidence, demonstrate that the claimant is disabled. Where subjective claims are not completely supported by the administrative record, an ALJ will consider the frequency and duration of the symptoms, precipitating and aggravating factors, the effect of medication, treatment, functional restrictions, and the claimant's daily activities. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

## 2. Five-Step Inquiry

The Commissioner's determination of disability follows a five-step, sequential evaluation. *Cichocki v. Astrue*, 729 F.3d 172, 173 n.1 (2d Cir. 2013); *Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013). First, the Commissioner determines whether the claimant is employed. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).[4] If the claimant is not employed, the Commissioner then considers whether the claimant has any "severe impairment" that significantly limits his or her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). The Commissioner moves on to step three if the claimant is found to have a severe impairment: whether, based on the medical evidence, the claimant has an impairment that is listed in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R., Part 404, Subpart P, Appendix 1. If the claimant has a listed impairment, she is disabled. *Id.*; 20 C.F.R. § 404.1520(d). If not, at the fourth step, the Commissioner must determine whether the claimant has the residual functional capacity ("RFC") to perform her past work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, the fifth step requires the Commissioner to determine whether the claimant has the ability to perform any other work, assuming she does not have the RFC to perform her past work. 20 C.F.R. § 404.1520(a)(4)(v).

---

[4] The five-step analysis is the same for disability determinations for DIB and SSI claimants. *Compare* 20 C.F.R. § 404.1520(a)(4), *with* 20 C.F.R. § 416.920(a)(4)(i). The Court will cite only § 404.1520 going forward.

The plaintiff has the burden of proof on the first four steps. At the fifth step, the burden shifts to the Commissioner to show that there are other jobs the claimant could perform. *Selian*, 708 F.3d at 418. Often, "the Commissioner meets his burden at the fifth step by resorting to the applicable medical vocational guidelines (the grids)." *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *amended in part on other grounds on reh'g*, 416 F.3d 101 (2d Cir. 2005) (citation and internal quotation marks omitted).

### 3. Treating Physician Rule

Opinions of a claimant's treating physician must be given controlling weight by the ALJ if those opinions are supported by medically acceptable diagnostic techniques and if those opinions do not conflict with other substantial evidence in the record. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). If the ALJ does not accord controlling weight to a treating physician's opinion, he must consider several factors to determine how much weight the opinion should receive. 20 C.F.R. § 404.1527(c)(2)(i), (2)(ii), (3)-(6). "[T]he ALJ must explicitly consider, *inter alia*: (1) the [frequency], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418. An ALJ's failure to provide "good reasons" for not crediting a treating physician's opinion is grounds for a remand. *Greek*, 802 F.3d at 375 (quoting *Burgess*, 537 F.3d at 129-30).

Importantly, however, "[t]o the extent [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see also Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing duty to seek more information

from physician if findings are insufficient). As a result, "the 'treating physician rule' is inextricably linked to the duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-cv-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

## II. The ALJ's Decision

In his decision, the ALJ evaluated Brown's claims for SSI and DIB pursuant to the five-step sequential evaluation set forth in 20 C.F.R. § 404.1520 and § 416.920. First, the ALJ found that Brown met the insured status requirements of the Social Security Act and had not engaged in substantial gainful activity since the alleged disability onset date. R. at 16.[5] At the second step, the ALJ determined that Brown had the following severe impairments: (1) diabetes mellitus, (2) hypertension, (3) cardiac disease, and (4) obesity. *Id.* He determined that Brown's other ailments—hip pain, asthma, and depression—were minimal and did not rise to the level of a severe impairment. *Id.* at 16-17. At the third step, the ALJ determined that Brown's impairments did not meet or equal any of the impairments listed in Appendix 1 of the regulations. *Id.* at 18. While obesity is not a listed impairment, the ALJ noted that he considered

---

[5] The ALJ cited October 4, 2010 as the alleged disability onset date. Brown engaged in substantial gainful employment after October 4, 2010, and sent a letter to the ALJ requesting amendment of the alleged onset date to June 24, 2014, her last date of employment. R. at 143-44. The ALJ did not cite this letter in determining Brown's alleged onset date. Ultimately, this seems to have been a harmless error because the ALJ concluded that Brown had not been employed since the alleged onset date, which is true as of June 24, 2014, but not October 4, 2010. *See, e.g., Miller v. Colvin*, 2014 WL 2047903, at *6-7 (M.D.Pa. May 19, 2014) (explaining that harmless error as to alleged onset date did not affect the ALJ's decision and was not grounds for remand). The Court will analyze the merits of Brown's claim based on the understanding that her alleged disability onset date is June 24, 2014.

16

Brown's obesity and the "possible impact on [her] functioning," both physically and socially. *Id.* Plaintiff does not appear to challenge the ALJ's findings with respect to the first three steps.

At step four, the ALJ determined that Brown had the RFC to perform the full range of medium work as defined in the regulations. *Id.* at 18-20. Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c). Medium work also encompasses the full range of sedentary and light work, the latter of which includes either "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b). In reaching this conclusion, the ALJ accorded Dr. Herscher's opinion little weight. R. at 20. He determined that Dr. Herscher's assessment of Brown's cardiac impairment was not supported by the record because Brown's July 2, 2014 EKG was "basically normal" and, while her June 20, 2014 test showed coronary artery disease, a subsequent stress test was negative for ischemia. *Id.* With regard to Brown's hip pain, the ALJ noted that he "could find very little, if anything about this complaint" in her more recent treatment notes from Mt. Sinai Hospital. *Id.* Similarly, the ALJ accorded little weight to Dr. Giraldo's determination that Brown should avoid prolonged standing due to her edema because some of the medical records showed that Brown did not have edema. *Id.*

At this step the ALJ also considered Brown's own statements of her symptoms, and concluded that, while Brown's impairments "could reasonably be expected to cause [her] alleged symptoms," Brown's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.*; *see also* 20 C.F.R. §§ 404.1529, 416.929. In particular, he noted that her "exams have been generally within normal limits and with full range of motion" and that Brown admitted non-compliance with her insulin regimen. R. at 20.

17

Having determined that Brown had an RFC for medium work, the ALJ determined that Brown was able to perform past relevant work as a childcare worker. *Id.* at 20-21. The ALJ therefore concluded that Brown was not disabled within the meaning of the Social Security Act.

## III. Analysis

Brown argues that the ALJ erred in three ways, all apparently tied to the ALJ's determination of Brown's RFC. In particular Brown argues that the ALJ: (1) failed to give proper deference to her treating physician's opinion; (2) improperly gave "little weight" to the opinion of the consulting examiner; and (3) gave undue weight to Brown's non-compliance with her diabetes treatment when assessing her credibility. At step four, the ALJ determined that Brown had the RFC to perform the full range of medium work. But there is nothing in the record to support his determination regarding Brown's ability to lift and carry or sit and stand; accordingly, the Court agrees with Brown that the ALJ erred on step four of his analysis, and remands this case for further proceedings.

First, regarding the ALJ's determination that Brown could lift up to 50 pounds and frequently lift and carry up to 25 pounds as is required for medium work, there is very little in the record. The evidence that is in the record does not support the ALJ's determination. The consulting physician, Dr. Giraldo did not opine on Brown's ability to lift or carry, but noted that her neurologic arm strength was 5/5. R. at 293. In response to a question from the ALJ, Brown testified at her hearing that she could lift a grocery bag weighing between five and ten pounds. *Id.* at 34. The ALJ did not ask her whether she could lift anything heavier than that. Dr. Herscher, Brown's treating physician, determined that Brown could only lift and carry between zero and ten pounds frequently, and could never carry more than 20 pounds. *Id.* at 317, 323. Dr. Herscher did not explain whether his determination was based on Brown's obesity, her

18

shortness of breath on exertion due to her cardiac disease, her hip pain, or a combination of Brown's ailments.

To give Dr. Herscher's opinion something less than controlling weight, the ALJ was required to "comprehensively set forth reasons" for doing so. *Halloran*, 362 F.3d at 33. The ALJ did not do so here, which is particularly apparent given the minimal other evidence in the record regarding Brown's ability to lift and carry. The ALJ stated that he gave Dr. Herscher's opinion, generally, "little weight" because it was "not supported." R. at 20. However, to sufficiently explain his reasons for discounting Dr. Herscher's opinion, the ALJ needed to explicitly consider the factors outlined in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c). *Selian*, 708 F.3d at 418; *accord Greek*, 802 F.3d at 376 (remand where ALJ did not explicitly consider factors). While the ALJ considered the third factor, noting specific instances in which he believed Dr. Herscher's findings contradicted the record, none of those instances relate to the particular question of Brown's ability to lift and carry weight. *See* R. at 20. Moreover, the ALJ did not explicitly consider any of the other factors he was required to consider nor can the Court glean how the ALJ viewed these other factors based on his decision.

Having rejected all of the evidence in the record regarding Brown's ability to lift and carry objects, the ALJ was left with no evidence in the record on which to base his determination of the maximum amount of weight Brown could carry and, in turn, support his conclusion that Brown had the RFC to perform medium work. Accordingly, it seems that the ALJ's duty to develop the record is implicated here as well. *See, e.g., Paterson v. Colvin*, No. 12-cv-3020 (LTS) (JLC), 2014 WL 4419688, at *13-14 (S.D.N.Y. Sept. 9, 2014) (finding that ALJ failed to develop record where no function by function assessment in record to assess RFC) (collecting cases), *report and recommendation adopted*, 2014 WL 4977493 (S.D.N.Y. Oct. 3, 2014).

Second, in determining that Brown could perform work which might involve "a good deal of walking or standing," the ALJ rejected both Dr. Herscher's and Dr. Giraldo's opinions that Brown should avoid prolonged standing, as well as Brown's own testimony. R. at 20; *see id.* at 33, 294, 317, 323.[6] He did so on the basis that the medical records sometimes reflect that Brown did not have edema in her legs. *Id.* at 20. While an ALJ is entitled to weigh conflicting evidence in the record, here, it seems that the ALJ simply cherry-picked instances in which doctors noted that Brown did not have edema, while ignoring instances where she was found to have edema, without considering what could have been causing this discrepancy. *See, e.g., Molina v. Colvin*, No. 13-cv-4989 (AJP), 2014 WL 3445335, at *17 (S.D.N.Y. July 15, 2014).

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's opinion is not supported by substantial evidence, and the case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further hearings consistent with this Opinion. The Commissioner's motion for judgment on the pleadings is therefore denied and Brown's motion for judgment on the pleadings is granted to the extent that it requests a remand for rehearing. The Clerk of Court is respectfully requested to terminate all pending motions and close this case.

**SO ORDERED.**

Dated: August 31, 2017
New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**

---

[6] The ALJ did not specify whether Brown's ability to perform the requirements of light work was based on her ability to do "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls," or both, further hindering the Court's review.

20